IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| CHARLES H. HOOFNAGLE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:15cv00008 |
| | ) | |
| | ) | |
| SMYTH-WYTHE AIRPORT COMMISSION, | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Charles H. Hoofnagle ("Hoofnagle or "Plaintiff"), by counsel, states as follows as his First Amended Complaint against defendants Smyth-Wythe Airport Commission (the "Commission"), Curtis Pennington, in his official capacity, Wilson L. Leonard, in his individual and official capacities, Donald E. Elmore, in his individual and official capacities, John R. Benham, in his individual and official capacities, Franklin P. Slavin, Jr., in his individual and official capacities, Scott Freeman, in his individual and official capacities, Mike Edwards, in his official capacity, and Williams T. Dungan, in his individual and official capacities (collectively "Defendants").

**NATURE OF ACTION**

1. This case is about e-mail, privacy, and free speech. On February 15, 2013, Hoofnagle, the then-Operations Manager for the Mountain Empire Airport in Rural Retreat, Virginia (which is operated by the Commission), received an e-mail from U.S. Senator Tim Kaine. The e-mail, one of many Sen. Kaine sent out in the wake of the mass

1

shooting in Sandy Hook, Connecticut, set forth his views on gun control and specifically mentioned limits on "combat-style weapons." Hoofnagle, however, is a gun owner and an ardent supporter of Second Amendment rights. In general, he opposes gun control. He responded to Sen. Kaine's e-mail with an e-mail of his own – which was sent from his own e-mail account, on a Saturday morning, and while taking a break from his work. In it, in strong but non-threatening tones, Hoofnagle told Sen. Kaine that he should stick up for the rights of gun owners, that he should join the National Rifle Association ("NRA"), and that he should be otherwise voted out of office. He also told Sen. Kaine essentially to stop hassling the "competent gun owner." The Commission soon learned of Hoofnagle's e-mail to Sen. Kaine and fired him because of it. Even worse, it then snooped into Hoofnagle's e-mail account – *after his termination* -- and, without authorization, locked him out of his own account while it apparently looked for "dirt" on him. These actions violate both the U.S. Constitution and federal law. As such, Hoofnagle now brings this action against the various defendants (i) under 42 U.S.C. § 1983 ("Section 1983") for violating his First Amendment free speech rights and his Fourth Amendment privacy rights; and (ii) under the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2711, *et seq.* for unlawfully accessing his personal e-mails.

### JURISDICTION AND VENUE

2. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. The request by Plaintiff for declaratory relief is authorized by 28 U.S.C. §§ 2202.

4. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

**PARTIES**

5. Hoofnagle is an individual resident of Atkins, Virginia.

6. The Commission is a public entity created, pursuant to Va. Code § 2-155, as a political subdivision collectively of Smyth County, Wythe County, the Town of Marion, and the Town of Wytheville. It is comprised of six members: one chosen by each of the four participating public entities (four in total), one chosen jointly by the Town of Marion and Smyth County, and one chosen jointly by the Town of Wytheville and Wythe County. *See* Va. Code § 2-156. Under its By-Laws, the Commission is governed by a Chairman, a Vice-Chairman, a Treasurer, and a Secretary. All of these officers are required to be members of the Commission except for the Secretary.

7. In its capacity as a public entity, the Commission operates the Mountain Empire Airport (the "Airport"), located at 8223 Lee Highway in Rural Retreat, Virginia. As part thereof, it has the power to hire and fire employees who work on behalf of the Airport, including the Airport Operations Manager. *See* Va. Code § 2-158.

8. Pennington is the current Chairman of the Commission. He is sued in his official capacity.

9. Leonard is a former member of the Commission and the former Chairman of the Commission. He was the Chairman of the Commission at the time of the relevant

3

allegations described herein, and he took or caused to be taken many of the unlawful acts described herein.  He is sued in his individual and official capacities.

10. Elmore is the current Vice-Chairman of the Commission and, at all relevant times herein, has been the Vice-Chairman of the Commission. He is sued in his individual and official capacities.

11. Benham is the current Treasurer of the Commission and, at all relevant times herein, has been the Treasurer of the Commission. He is sued in his individual and official capacities.

12. Slavin is a member of the Commission and has been such a member at all relevant times herein. He is sued in his individual and official capacities.

13. Freeman is a former member of the Commission and the former Secretary of the Commission.  He was a member of the Commission at all relevant times herein. He is sued in his individual and official capacities.

14. Dungan is a member of the Commission and has been such a member at all relevant times herein. He is sued in his individual and official capacities.

15. Edwards is a current member of the Commission.  He is sued in his official capacity.

**FACTS**

A. **HOOFNAGLE'S TENURE AS THE OPERATIONS MANAGER OF THE AIRPORT**

16. From April 2011 until March 4, 2013, Hoofnagle was the Operations Manager of the Airport.  Prior to being appointed to the position of Operations Manager, Hoofnagle had worked full time at the Airport since 2004.

4

17. In his capacity as the Operations Manager, Hoofnagle was responsible for virtually all of the day-to-day operations of the Airport. Among other things, he

- took care of all refueling of airplanes and fuel inventory;

- handled mowing and maintenance of the Airport;

- handled customer service, including answering phone calls (which he did, both at the Airport and at home using his cell phone);

- responded to emails from the public and customers;

- got aircraft out of the Airport hangars for their owners to use;

- prepared time cards and hours for all employees; and

- handled all month-end business for the Airport, including the billing of customers.

18. As the Airport's Operations Manager, Hoofnagle also was required to – and did – attend the Commission's monthly meetings. At those meetings, Hoofnagle routinely updated the Commission about Airport business and also coordinated and planned upcoming Airport tasks and operations with the Commission members.

19. In general, as Operations Manager, Hoofnagle worked six days a week (Monday through Saturday) and kept on-site office hours at the Airport from approximately 8:00 a.m. to 6:00 p.m.

**B.    HOOFNAGLE'S LONG-TIME SUPPORT FOR SECOND AMENDMENT RIGHTS**

20. Hoofnagle is a lifelong gun user and owner. His grandfather first taught him how to hunt rabbits when he was approximately seven years old, and his grandfather also bought him his first gun (a .30-.30 rifle) when he was approximately ten.

21. Since then, Hoofnagle has regularly used guns (legally) to hunt all types of animals in Virginia.

22. Since then, Hoofnagle also has owned numerous types of guns, including antique weapons. Among other things, Hoofnagle currently owns (i) several AR platform rifles (including AR-15's), (ii) several handguns; (iii) shotguns; and (iv) various rifles. All of these weapons are owned and used lawfully.

23. Hoofnagle has long supported the responsible, competent, and safe use of guns. Indeed, within the last two years alone, Hoofnagle has regularly taught courses on gun safety related to obtaining a Virginia concealed weapon permit.

24. Relatedly, Hoofnagle has long supported the rights of gun owners under the Second Amendment. He has long opposed gun control measures as being contrary to his Second Amendment rights and, further, has long believed that gun control, in general, is not the correct way to solve problems associated with gun violence.

25. Notably, Hoofnagle particularly dislikes, and has long opposed, those gun control measures – such as banning so-called "assault weapons" (such as the AR-15) or limiting the size of their magazines -- that are generally advocated by or associated with Congressional Democrats and/or liberal lawmakers.

26. Finally, although he is not an ideologue with respect to gun control issues, Hoofnagle has routinely voted *against* politicians who support gun control measures.

C.   E-MAIL ACCOUNTS, USE, AND POLICIES AT THE AIRPORT

27. Not too long after Hoofnagle first became employed at the Airport (probably sometime in 2005), he created an e-mail account with the address of charliemkj@yahoo.com.

He used it, however, for both personal and business purposes, and it was never an "official" e-mail address that was owned or operated by the Airport or the Commission. Indeed, no one for or on behalf of the Airport or the Commission ever paid for any services related to the e-mail address, nor did any such persons (or the Airport or the Commissions as entities) ever claim any rights to, or ownership of, this e-mail address. To this day, even *long after* his termination by the Commission, Hoofnagle continues to use this e-mail as his primary personal e-mail address.

28. Of note, the "mkj" letters in Hoofnagle's e-mail address is a reference to the "call letters" for the Airport. However, Hoofnagle included those letters on his own as a point of personal pride for working at the Airport. No one at the Airport or for or on behalf of the Commission had any input or direction as to what letters or words to use in Hoofnagle's e-mail address. Nor did anyone at the Airport or for or on behalf of the Commission assist Hoofnagle in setting up the e-mail address or require that he have an address that referenced the Airport in any way.

29. Indeed, during Hoofnagle's entire tenure as an employee of the Commission, neither the Airport nor the Commission had any official e-mail address for Airport business. For example, although the Airport had an internet domain name (mtnempireairport.com) during Hoofnagle's employment there, neither it nor the Commission ever set up specific dedicated Airport or Commission e-mail addresses (such as wilson@mtnempireairport.com

or charlie@mtinempireairport.com) for Hoofnagle or the Commission members.[1] Instead, all of the Commission members, just like Hoofnagle, used their own personal e-mail addresses to handle Airport and Commission business.

30. For his part, Hoofnagle used his charliemkj@yahoo.com e-mail address for both personal and business matters. Importantly, Hoofnagle set up numerous types of personal on-line communications and transactions – such as mortgage payment alerts and banking alerts -- using this e-mail address. He also routinely used this address to engage in personal communications with his wife and friends about things that had nothing at all to do with Airport or Commission business.

31. During Hoofnagle's employment at the Airport, no one other than Hoofnagle -- and possibly his wife -- knew the password for this e-mail address.

32. Relatedly, neither the Airport nor the Commission ever promulgated or adopted any type of e-mail or computer policies for Airport or Commission employees during the time of Hoofnagle's employment. Hoofnagle, for example, was never prohibited by any mandates from the Commission from engaging in personal matters on his workplace computer during down time at the workplace or during personal breaks while he was at the Airport. Nor did the Commission ever adopt or implement any rules or restrictions on what kinds of communications could be contained or disseminated by e-mail.

---

[1] Upon information and belief, this is still the case, even after Hoofnagle's termination. One notable difference, however, is that the Airport/Commission now uses an "official" e-mail address: "mtnempireairport@yahoo.com."

8

33. Quite the opposite, e-mail usage by and to Airport and Commission members was particularly unrestrained. On at least one notable occasion, for example, a Commission member circulated to various persons (including Hoofnagle and *two existing members of the Commission*) an e-mail that could only charitably be described as "politically incorrect." It purported to be an invitation to a rigorous and expensive "canoe trip" through Cherokee Nation territory. However, in a poor effort at chauvinistic humor, it then led the reader to scroll down to the bottom of the e-mail to show a picture of the alleged Cherokee Indian tour guide, who was a naked woman standing in a river next to a raft. Under the picture were the words (in bold print): "Her Name is UCAN TUCHUM." Upon information and belief, the Commission member who sent out the e-mail was never disciplined or punished for sending out the e-mail and he remained in his position on the Commission.

D.  **USING HIS PERSONAL E-MAIL AND HIS PERSONAL TIME, HOOFNAGLE RESPONDS TO AN E-MAIL FROM U.S. SENATOR TIM KAINE REGARDING GUN CONTROL**

34. On February 15, 2013, Sen. Kaine sent Hoofnagle an e-mail regarding gun control. It was one of many e-mails that Hoofnagle had received from Sen. Kaine about gun control in the wake of the December 2012 mass shooting at an elementary school in Sandy Hook, Connecticut. A true and accurate copy of Sen. Kaine's e-mail is attached hereto as **Exhibit A**.

35. Among other things, this particular Kaine e-mail referenced the 2007 shooting at Virginia Tech, Project Exile, and the gun violence that had existed in Richmond, Virginia in the 1990's. With these examples in mind, Sen. Kaine said that the "right approach" to reducing gun violence involved various options, including "common sense rules about gun

9

use." Sen. Kaine also said that he strongly supported "universal background record checks" and was "open to supporting legislation placing reasonable limits on high capacity magazines [and] combat-style weapons." *Id.*

36. The e-mail was sent to Hoofnagle at 6:28 p.m. on Friday, February 15, 2013.

37. The next morning – Saturday, February 16, 2013 – Hoofnagle, using his personal e-mail address and while taking a break from his work at the Airport, responded. Strongly disagreeing with Sen. Kaine's support of gun control, Hoofnagle wrote:

> Dear, Mr. Kain. [sic] I own over 9 AR.platform rifles. and 30 some various other rifles and shotguns, a dozen handguns, I suggest you stick up for the rights of all gun owners in Va. In my opinion you and your kind (Liberals) ARE a CANCER to this state and COUNTRY, therefore I have gone to the voting polls every Nov. to try and eradicate you and your kind from public office, and will continue to do so. We do not have a gun problem, We have an IDIOT PROBLEM, go deal with that, and not the competent gun owner. Here is the Va. NRA tollfree # 1-800-672-3888. Now you can join the NRA. So you can be apart [sic] of something with some substance and character. .. Charles H. Hoofnagle. Airport Operations Manager Mt. Empire Airport in south west Va. 276-685-1122.

An initial version of the e-mail is attached as **Exhibit B**.

38. Hoofnagle received no response to his e-mail from Sen. Kaine's office or anyone else in state or federal government.

E. **THE COMMISSION DISCOVERS HOOFNAGLE'S E-MAIL TO SEN. KAINE AND FIRES HIM BECAUSE OF IT**

39. Soon after Hoofnagle sent his e-mail to Sen. Kaine, certain members of the Commission, particularly Wilson Leonard, learned of it and believed its dissemination was possible grounds for termination. Over the next several days, certain Commission members,

particularly Leonard, investigated the genesis of the e-mail and, in doing so, expressed their beliefs that sending out the e-mail did not show good judgment. Ironically, included in the group of persons involved in this discussion were the author and two Commission member recipients of the Cherokee Indian "canoe trip" e-mail.

40. Ultimately, upon information and belief, Leonard gave the Commission an ultimatum – either the Commission had to fire Hoofnagle or he (Leonard) would resign. Upon information and belief, the Commission succumbed to the threat and apparently voted to terminate Hoofnagle.

41. On March 4, 2013, at approximately 10:00 a.m., Leonard, on behalf of the Commission, terminated Hoofnagle because of his e-mail to Sen. Kaine.

F. SEPARATELY, AFTER IT TERMINATED HOOFNAGLE, THE AIRPORT, WITHOUT AUTHORIZATION, LOCKED HOOFNAGLE OUT OF HIS OWN E-MAIL ACCOUNT

42. The day – March 4, 2013 -- Hoofnagle was terminated was a Monday. Soon thereafter, however, the Commission, upon information and belief, instructed an Airport employee to hack into Hoofnagle's personal e-mail account and snoop through his private e-mails.

43. Upon information and belief, this "hacking" was enabled by the Airport employee looking through a notebook on Hoofnagle's old desk, finding his password, using it to access his e-mail account, and then changing the password. At no time did Hoofnagle or anyone on his behalf provide his personal password to anyone at the Airport or any Commission members.

44. Nor did Hoofnagle ever authorize the Airport or the Commission to have access to his personal and private e-mail. Indeed, by the time of the "hacking," Hoofnagle was no longer employed by the Commission.

45. Hoofnagle learned of the Commission's snooping when he tried to access his e-mail (in order to handle some of his personal financial affairs) later in the week but was unable to do so because his personal password no longer worked. He immediately called an Airport employee who told him that "Will [Leonard] shut it down" (in reference to his personal e-mail account).

46. Hoofnagle then called Leonard and asked "What have you done to my e-mail?" Leonard responded by saying that he had shut it down. Hoofnagle told Leonard that he had no right to get into his personal e-mail account, but Leonard disagreed and said that he had wanted to look through Hoofnagle's e-mails. Hoofnagle reiterated that the e-mail account was his personal e-mail account and that he needed access to it. Leonard finally relented and gave Hoofnagle the new password. Hoofnagle immediately logged into the account and changed the password.

**G.  AFTERMATH**

47. Since the date of his unlawful termination in March 2013, Hoofnagle has been unable to find comparable replacement employment and has suffered substantial emotional distress.

12
Case 1:15-cv-00008-JPJ-PMS   Document 30   Filed 08/28/15   Page 12 of 19   Pageid#: 200

## COUNT I:
### FIRST AMENDMENT RETALIATION CLAIM UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

48. The allegations of paragraphs 1-47 are realleged as if fully set forth herein.

49. Hoofnagle engaged in protected activity under Section 1983 (through the Fourteenth Amendment to the United States Constitution) when he exercised his free speech rights under the First Amendment to the U.S. Constitution by expressing his personal beliefs on gun control in his e-mail to Senator Kaine. Communicating these beliefs was *not* part of Hoofnagle's job responsibilities (such that they are not excluded from protection as some type of work-related speech) and they were expressed by him as a general member of the public.

50. Defendants were aware of Hoofnagle's protected activities and were aware that any retaliation based on such protected activities would violate Hoofnagle's rights under, among other statutes and provisions, Section 1983.

51. Notwithstanding this awareness, Defendants retaliated against Hoofnagle based on his protected activity by firing him on March 4, 2013 because of his e-mail to Sen. Kaine.

52. Defendants acted with malicious intent to deprive Hoofnagle of his First Amendment rights, as secured under Section 1983, and to do him injury.

53. As a direct result of the Defendants' actions, in violation of the rights secured to Hoofnagle under Section 1983, Hoofnagle has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith.

Additionally, Hoofnagle has been caused to suffer personal injury, anxiety, emotional distress, personal humiliation and embarrassment as a result of the Defendants' actions.

54. Further, Defendants' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Hoofnagle's rights, thus entitling him to punitive damages

## COUNT II:
### FOURTH AMENDMENT SEARCH AND SEIZURE VIOLATION
### CLAIM UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

55. The allegations of paragraphs 1-54 are realleged as if fully set forth herein.

56. In pertinent part, the Fourth Amendment of the United States Constitution states:

> [t]he right of the people to be secure in their persons . . . papers, and effects against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. Amend. IV.

57. The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy. Here, Hoofnagle had such reasonable expectation. Neither the Commission nor the Airport implemented any type of e-mail use or surveillance policy. Neither the Commission nor the Airport ever had access to or monitored Hoofnagle's e-mail use. And neither the Commission nor the Airport ever notified Hoofnagle that it reserved the right to monitor or investigate his e-mail usage.

58. Here, Defendants violated Hoofnagle's Fourth Amendment rights when they impermissibly hacked into his personal e-mail account and then snooped through his personal e-mails.

59. Additionally, Defendants did not have the right to conduct any kind of workplace misconduct investigation that would justify violating Hoofnagle's Fourth Amendment rights. Indeed, here, by the time Defendants violated Hoofnagle's Fourth Amendment rights, he had already been terminated based on the Kaine e-mail (of which the Commission was already fully aware) so no justification for suspecting any additional misconduct existed. Separately, the search itself of Hoofnagle's e-mails was excessively intrusive and otherwise not reasonably related to any allegations of workplace misconduct.

60. Defendants acted with malicious intent to deprive Hoofnagle of his Fourth Amendment rights, as secured under Section 1983, and to do him injury.

61. As a direct result of the Defendants' actions, in violation of the rights secured to Hoofnagle under Section 1983, Hoofnagle has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Hoofnagle has been caused to suffer personal injury, anxiety, emotional distress, personal humiliation and embarrassment as a result of the Defendants' actions.

62. Further, Defendants' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Hoofnagle's rights, thus entitling him to punitive damages

# COUNT III:
## VIOLATION OF STORED COMMUNICATIONS ACT
## (AGAINST ALL DEFENDANTS)

63. The allegations of paragraphs 1-62 are realleged as if fully set forth herein.

64. Under the Stored Communications Act ("SCA"), it is unlawful to

(1) intentionally access[] without authorization a facility through which an electronic communication service is provided; or

(2) intentionally exceed[] an authorization to access that facility; and thereby obtain[], alter[], or prevent[] authorized access to a wire or electronic communication while it is in electronic storage in such system.

18 U.S.C. § 2701 (a).

65. Here, Defendants violated the act by intentionally accessing Hoofnagle's private e-mails without authorization and/or by exceeding their authorization and then altering and preventing Hoofnagle from accessing his personal e-mails.

66. As a result of Defendants' violations of the SCA, Hoofnagle is entitled to all appropriate damages and remedies under the statute, including but not limited to actual damages, punitive damages, and attorney's fees.

WHEREFORE, Plaintiff respectfully prays that this Court:

A. Accept jurisdiction of this case.

B. Declare that Plaintiff has suffered acts of retaliation at the hands of Defendants under Section 1983 (because of the exercise of his rights under the First Amendment to the United States Constitution).

C. Declare that Plaintiff has suffered Fourth Amendment violations at the hands of Defendants under Section 1983.

16
Case 1:15-cv-00008-JPJ-PMS   Document 30   Filed 08/28/15   Page 16 of 19   Pageid#: 204

D.  Declare that Plaintiff has suffered violations of the SCA.

E.  Award Plaintiff compensation for loss of salary and other benefits, including all fringe benefits, to which he would have been entitled had he not been retaliated against in his employment. Such damages shall be in an amount in excess of one and half million dollars ($1,500,000.00), the exact amount to be determined at trial.

F.  Award Plaintiff compensatory damages for the humiliation, damage to his reputation, mental and emotional distress, and pain and suffering that he has experienced and endured as a result of the unlawful actions of Defendant towards him. Such damages shall be in an amount in excess of one million dollars ($1,000,000.00), the exact amount to be determined at trial.

G.  Grant Plaintiff punitive damages against Defendants. Such damages shall be in an amount no less than $500,000.00, the exact amount to be determined at trial.

H.  Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law.

I.  Grant Plaintiff all statutory damages allowed under the SCA, including actual damages and punitive damages and attorney's fees.

J.  Grant Plaintiff his reasonable expenses, costs and attorneys' fees.

**A TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

CHARLES H. HOOFNAGLE

By: s/ Richard F. Hawkins, III
 Virginia Bar Number: 40666
 THE HAWKINS LAW FIRM, PC
 2222 Monument Avenue
 Richmond, Virginia 23220
 (804) 308-3040 (telephone)
 (804) 308-3132 (facsimile)
 rhawkins@thehawkinslawfirm.net

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of August 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF systems which will send notification of such filing to the following:

Henry S. Keuling-Stout
Keuling-Stout, P.C.
P.O. Box 400
Big Stone Gap, VA 24219
276-523-1676
Fax: 523-1608
Email: keulingstout@gmail.com

and

Jim H. Guynn, Jr.
Michael William Smith Lockaby
Guynn & Waddell, PC
415 S. College Avenue
Salem, VA 24153
540-387-2320
Fax: 540-389-2350
Email: jimg@guynnwaddell.com
Email: mikel@guynnwaddell.com

<u>s/ Richard F. Hawkins, III</u>
Virginia Bar Number: 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirm.net

Counsel for Plaintiffs