# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **CHARLES H. HOOFNAGLE,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:15CV00008 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **SMYTH-WYTHE AIRPORT** | ) | By:  James P. Jones |
| **COMMISSION, ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Richard F. Hawkins, III, The Hawkins Law Firm, PC, Richmond, Virginia, for Plaintiff; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, and Jim H. Guynn, Jr. and Michael W.S. Lockaby, Guynn & Waddell, P.C., Salem, Virginia, for Defendants.*

In this case, the plaintiff, a former public employee, claims that the defendants violated his rights under the First and Fourth Amendments to the Constitution, as well as the Stored Communications Act.  The plaintiff contends that he was fired because of an email he sent to a member of Congress and that thereafter his employer accessed his email account without his permission.  Based on the undisputed facts, I will grant in part and deny in part the defendants' Motion for Summary Judgment.

I.

The essential facts, taken from the summary judgment record and recited in the light most favorable to the nonmovant, are as follows.

From April 2011, until March 4, 2013, the plaintiff, Charles H. Hoofnagle, was employed as the Operations Manager of the Mountain Empire Airport (the "Airport"), located in Rural Retreat, Virginia. The Airport is owned by Smyth and Wythe counties and receives funding from these two counties, the towns of Marion and Wytheville, Virginia, and the Federal Aviation Administration ("FAA").

The Airport is operated by the Smyth-Wythe Airport Commission (the "Commission"), a public entity and a political subdivision of the counties and towns. The Commission is comprised of six members who are appointed by the counties and towns. The Commission has the power to hire and fire employees of the Airport.

As Operations Manager, Hoofnagle reported to the Commission and was responsible for the day-to-day operations of the Airport. Among other things, Hoofnagle was responsible for fuel inventory, maintenance of the Airport, customer service, including answering phone calls and responding to emails from the public and customers, and month-end business, including billing. Hoofnagle generally worked six days a week and kept on-site office hours from approximately 8:00 a.m. to 5:00 p.m.

Soon after Hoofnagle first began working for the Airport, he created a Yahoo! Mail ("Yahoo!") email account with the address of charliemkj@yahoo.com. The "mkj" letters in the email address reference the FAA identifier for the Airport. Hoofnagle used this account for both personal and business purposes. Although the account was not owned by the Airport, its address was held out to the public as an official contact for the Airport and provided to nearly all vendors and customers. It was the email address on file with the FAA and the Virginia Department of Aviation.

Throughout Hoofnagle's employment, the Airport did not maintain any other email address for its business and the Commission never adopted any email or computer use policies for its employees. Hoofnagle understood that when he communicated with the public on charliemkj@yahoo.com, he was speaking on behalf of the Airport. (Hoofnagle Dep. 61, 62-63, ECF No. 43-1.)

Hoofnagle is an advocate of Second Amendment rights. He has lawfully owned and used numerous types of guns and teaches courses on gun safety for the National Rifle Association.

After the Newtown mass school shooting, United States Senator Tim Kaine sent a letter to Hoofnagle addressing the issue of gun violence, apparently in response to a communication on that issue from Hoofnagle. In an email dated February 16, 2013, Hoofnagle replied to Senator Kaine as follows:

From: Charlie Hoofnagle <charliemkj@yahoo.com>
To: U.S. Senator Kaine <senator@kaine.senate.gov>
Sent: Saturday, February 16, 2013 9:14AM
Subject: Re: Reply from Senator Kaine

Dear, Mr. Kain [sic]. I own over 9 AR platform rifles and 30 some various other rifles and shotguns, a dozen handguns, I suggest you stick up for rights of all gun owners in Va. In my opinion you and your kind (Liberals) ARE a CANCER to this state and COUNTRY, therefore I have gone to the voting polls every Nov. to try and eradicate you and your kind from public office, and will continue to do so. We do not have a gun problem, We have an IDIOT PROBLEM, go deal with that, and not the competent gun owner. Here is the Va. NRA tollfree # 1-800-672-3888. Now you can join the NRA. So you can be apart [sic] of something with some substance and character…Charles H. Hoofnagle. Airport Operations Manager Mt. Empire Airport in south west Va. 276-685-1122

(First Am. Compl. Ex. B, ECF No. 30-2.)

The prior letter from Senator Kaine to Hoofnagle about gun violence did not mention the Airport or its business and was not addressed to the Airport but to Hoofnagle personally at his home address. Nevertheless, Hoofnagle signed his reply email using his official Operations Manager title and specifically referenced the Airport. In addition, he included the cell phone number for the Airport rather than his personal telephone number.

On March 4, 2013, during a closed session meeting, the Commission unanimously voted to terminate Hoofnagle. This decision was based predominantly on Hoofnagle's choice to sign the email to Senator Kaine using his

- 4 -

official title of Operations Manager of the Airport.[1]  The defendants concede that if Hoofnagle had not sent the email, he would not have been terminated.[2]  The defendants also concede that Hoofnagle's email had no direct affect on Airport operations.

After Hoofnagle's employment had been terminated, Wilson Leonard, who was chairman of the Commission, accessed Hoofnagle's email account using a password provided by Christina Dunavant, the Airport secretary.  The defendants assert that Leonard accessed the account in order to retrieve business records of the Airport.  Hoofnagle did not authorize the Commission or its members to access the account at that time.  Furthermore, although the defendants disagree, Hoofnagle contends that he never shared his password for the email account with anyone at the Airport.[3]

Hoofnagle has sued the Commission and its members for his termination as well as for accessing his email account, seeking compensatory, punitive and

---

[1]  In addition to the email, the defendants contend that several other factors contributed to the Commission's decision to terminate Hoofnagle, including the fact that Hoofnagle lied to the Commission about sending the email with his official title.

[2]  The defendants claim that Hoofnagle ultimately would have been released from employment because the Commission intended to replace him with an Airport manager with broader duties.

[3]  Both Leonard and Dunavant testified in their depositions that Hoofnagle provided the password for the email account to them on several occasions.  The defendants also filed an affidavit of Dunavant stating that Hoofnagle had given her the password.

statutory damages.[4]  Following discovery, the defendants have moved for summary judgment in their favor.  The defendants challenge all of the causes of action levied against them and assert numerous arguments in favor of their motion for summary judgment.  The defendants' motion is ripe for decision, having been fully briefed by the parties.[5]

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party."  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

---

[4]  Subject-matter jurisdiction of this court exists pursuant to 28 U.S.C. § 1331.

[5]  I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

- 6 -

Rule 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is not "a disfavored procedural shortcut," but rather a valuable mechanism for excluding "claims and defenses [that] have no factual basis." *Id.* at 327. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks and citation omitted).

In addition to a claim under the Stored Communications Act (Count III of the First Amended Complaint), Hoofnagle has asserted First and Fourth Amendment claims against the defendants under 42 U.S.C. § 1983 (Counts I and II). A § 1983 claim requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

### A. First Amendment Claim.

The defendants first argue that summary judgment is appropriate because Hoofnagle's speech was not protected by the First Amendment.

- 7 -

"The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "While government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Adams v. Trs. of Univ. of N.C.-Wilmington,* 640 F.3d 550, 560 (4th Cir. 2011). Whether the First Amendment protects certain speech is a question of law. *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

In evaluating whether a public employee has stated a claim under the First Amendment for retaliatory discharge, I must consider: "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision." *McVey*, 157 F.3d at 277-78. To avoid summary judgment, the plaintiff is "required to adduce evidence sufficient to show material facts in dispute as to each of the three prongs of the *McVey* test." *Adams,* 640 F.3d at 561. In the

present case, the defendants argue that Hoofnagle has failed to meet all three prongs of the test.

## 1. The First Prong of the *McVey* Test.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147-48. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Durham v. Jones,* 737 F.3d 291, 299-300 (4th Cir. 2013) (quoting *Kirby v. City of Elizabeth City,* 388 F.3d 440, 446 (4th Cir. 2004)). The public concern inquiry depends on "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Berger v. Battaglia,* 779 F.2d 992, 999 (4th Cir. 1985).

Considering Hoofnagle's email in context, there is little doubt that it was addressing a matter of public concern. The subject matter of the email was gun control, and it was drafted in response to a political solicitation. Although the defendants assert that Hoofnagle's interest in guns is strictly personal, courts regularly conclude that speech about the gun control debate constitutes a matter of public concern. *See, e.g., Buker v. Howard Cty.,* Nos. MJG-13-3046, MJG-13-3747, 2015 WL 3456750, at *10 (D. Md. May 27, 2015). Furthermore, although

the content of the email certainly was controversial, "[t]he inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). The more considerable issue in this case is whether Hoofnagle was speaking as a citizen or employee when he sent the email.

The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen about matters of public concern. If a public employee does not speak as a "citizen," the First Amendment does not protect that speech. *DiMeglio v. Haines,* 45 F.3d 790, 805 (4th Cir. 1995); *see also Connick,* 461 U.S. at 147. As a result, a question often arises whether an employee spoke as a citizen or an employee. Hoofnagle bears the burden of demonstrating that he was speaking as a citizen on a matter of public concern. *See, e.g., Brooks v. Arthur,* 685 F.3d 367, 371 (4th Cir. 2012).

In the present case, Hoofnagle's actions do not fit clearly into either those of a citizen or employee. Hoofnagle sent the email on a Saturday, during a break from work hours, suggesting the actions of a citizen. In doing so, he used his work computer and an email address that was used for both personal and business purposes. Hoofnagle chose to sign the email using his official job title, which suggests he was purporting to act as an employee. When speech is made in the workplace, it is entitled to less protection. *Connick,* 461 U.S. at 153.

- 10 -

The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Furthermore, "employees who have a policy-making or public-relations role receive very little First Amendment protection even for 'off-the-clock' speech." *Bowers v. Rector & Visitors of Univ. of Va.*, 478 F. Supp. 2d 874, 884 (2007). Therefore, to determine whether Hoofnagle sent the email as a citizen, it is necessary to consider the extent to which the email fits within his official job duties.

All parties agree that Hoofnagle had a public-relations role to some extent, and that he did have authority to speak on behalf of the Airport in certain circumstances. Indeed, Hoofnagle understood that when he communicated with the public using the Yahoo! email address, he was representing the Airport. This suggests that he was acting as an employee when he sent the email to Senator Kaine. However, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks,* 134 S. Ct. 2369, 2379 (2014). Here, the content of the speech at issue was gun control, and although his job as

- 11 -

Operations Manager occasionally required the use of guns, this was not an integral part of his job duties.[6]

Most importantly, Hoofnagle chose to sign the email using his professional title. "[W]hen one considers the *Garcetti* rule that an employee must speak as a citizen to claim protection; use of official letterhead is inconsistent with that requirement." *Bowers,* 478 F. Supp. 2d at 885. Hoofnagle understood that when he would sign a document as Operations Manager, he was representing and speaking on behalf of the Airport. Therefore, by signing the email using his official title, Hoofnagle was not speaking simply as a concerned citizen. As a result, he loses the cloak of First Amendment protection and has failed to satisfy the first prong of the *McVey* test.

### 2.    Second Prong of the *McVey* Test.

The second prong of the *McVey* test considers whether the employee's interest in speaking upon the matter of public concern is outweighed by the government's interest in providing effective and efficient services to the public.

First Amendment protection of speech on matters of public concern is not absolute and must be tempered by the government's interest in governmental

---

[6]    Because Hoofnagle's job responsibilities included the duty to "[e]nsure safe operating condition of the airfield by surveying the runway . . . and correcting any problems immediately by the means available to him," Hoofnagle occasionally used guns at work to keep animals from interfering with the operating condition of the airfield. (Am. Mot. for Summ. J. Ex. F, ECF No. 43-6.)

- 12 -

effectiveness, efficiency, order, and the avoidance of disruption. "As an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies. And for this purpose, the government has an interest in regulating the speech of its employees." *McVey*, 157 F.3d at 277 (citation omitted). "[T]he Government, as an employer, must have wide discretion of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Connick*, 461 U.S. at 151 (internal quotation marks and citation omitted).

Assuming, arguendo, that Hoofnagle had spoken as a citizen about a matter of public concern, the court would then apply the *Pickering* balancing test[7] to determine whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "Whether the employee's interest in speaking outweighs the government's interest is a question of law for the court." *Smith v. Gilchrist,* 749 F.3d 302, 309 (4th Cir. 2014). "Regarding this balancing, the government bears the burden of justifying the discharge on legitimate grounds." *Id.* (internal quotation marks and citation omitted).

---

[7] The *Pickering* test is appropriate only in cases where an "employee spoke as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest." *United States v. Nat'l Treasury Emps. Union,* 513 U.S. 454, 466 (1995) (internal quotation marks and citation omitted).

The *Pickering* balancing test requires consideration of whether the employee's speech: (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails. *McVey*, 157 F.3d at 278.

Here, several of the *Pickering* factors apply to Hoofnagle's email and indicate that the Airport's interest in providing effective and efficient services to the public outweighed Hoofnagle's interest in communicating the email. First, the language of the email and aggressive manner in which Hoofnagle communicated his opinions undermined Hoofnagle's credibility with the Commission and raised serious concerns about his judgment. Indeed, the extent to which the email impaired harmony among the Commission members was so great that one of the members threatened to resign if Hoofnagle remained an employee of the Airport.

Second, Hoofnagle's email also impacted the Airport's relationship with outside parties. Specifically, the president of the Pilot's Association questioned whether Hoofnagle should be fired for sending the email. In addition, several

- 14 -

members of the Commission were concerned that the email would adversely interfere with the operation of the agency and its funding. Furthermore, Hoofnagle's email was to Senator Kaine, not simply to co-workers in private.

Finally, Hoofnagle understood that he was representing the Airport when he communicated in his official capacity as Operations Manager. Accordingly, by signing the email with his title, Hoofnagle effectively used his authority as manager to bolster the weight of the email. "[A] public employee, who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *Id*. Because Hoofnagle, as Operations Manager, had public relations responsibilities and was the point of contact for the Airport, his speech had the potential to undermine the Commission and interfere with the operation of the Airport. Accordingly, Hoofnagle's speech is afforded less First Amendment protection.

Hoofnagle argues that the *Pickering* test requires that the defendants show the email caused some actual disruption in Airport operations. Any restrictions imposed by the government employer "must be directed at speech that has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418. However, the public employer is not required "to prove that the employee's speech actually

- 15 -

disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner,* 973 F.2d 295, 300 (4th Cir. 1992) (internal quotation marks and citation omitted). Furthermore, it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152; *see also Buker*, 2015 WL 3456750, at *11. As the undisputed facts make clear, the Commission reasonably apprehended that the email could have a negative effect on the operations and funding of the Airport.

Therefore, I find that the Commission's interests outweighed any public interest in Hoofnagle's speech and accordingly, Hoofnagle has failed to satisfy the second prong of the *McVey* test.

### 3. Third Prong of the *McVey* Test.

The third prong of the *McVey* test, the causation requirement, is a rigorous one. *See Huang v. Bd. of Governors of Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir. 1990). Hoofnagle bears the burden of demonstrating that his protected speech was a substantial factor in the Commission's decision to terminate him. "The initial burden lies with the plaintiff, who must show that his protected expression was a 'substantial' or 'motivating' factor in the employer's decision to terminate him." *Wagner v. Wheeler,* 13 F.3d 86, 90 (4th Cir. 1993).

- 16 -

> If the plaintiff successfully makes that showing, the defendant still may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination.

*Id.*

Hoofnagle has produced no evidence that directly supports his contention that he was terminated because of his speech. There is no question that had Hoofnagle not sent the email, he would not have been terminated at that time. However, each of the Commission members specifically articulated that the predominant factor in Hoofnagle's termination was his decision to sign the email using his official title as Operations Manager, not the particular content of the email itself. Hoofnagle offers no evidence to the contrary. Accordingly, Hoofnagle fails to satisfy the third prong of the *McVey* test.

In sum, although Hoofnagle's speech involved a matter of public concern, by signing the email using his official title, he was speaking as an employee and representative of the Airport, not as a citizen. In addition, even assuming that Hoofnagle was speaking as a citizen on a matter of public concern, his interests in doing so were outweighed by the Commission's interests as a government employer. Furthermore, Hoofnagle has failed to satisfy his burden of demonstrating that his speech was a substantial factor in his termination.

- 17 -

Accordingly, the defendants are entitled to summary judgment on Hoofnagle's First Amendment retaliation claim.

## B. Fourth Amendment Claim.

The defendants next argue that summary judgment is appropriate because Hoofnagle had no reasonable expectation of privacy in his email account, and the search of the account was reasonable.

The Fourth Amendment, applied to the States through the Fourteenth Amendment, prohibits unreasonable searches and seizures. "It is well settled that the Fourth Amendment's protection extends beyond the sphere of criminal investigations." *City of Ontario, Cal. v. Quon,* 560 U.S. 746, 755 (2010). "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 613-614 (1989). This is true regardless of whether the government action involves investigating a crime or performing some other function. *Quon,* 560 U.S. at 756. "The Fourth Amendment applies as well when the Government acts in its capacity as an employer." *Id.* "Searches and seizures by government employers or supervisors of the private property of their employees, therefore, are subject to the restraints of the Fourth Amendment." *O'Connor v. Ortega,* 480 U.S. 709, 715 (1987).

In *Quon*, 560 U.S. 746, the Supreme Court applied the tests for Fourth Amendment claims against government employers as set forth by the plurality and concurrence in *O'Connor*. The *Quon* court outlined the two-step plurality test as (1) an examination of the operational realities of the workplace in order to determine whether a reasonable expectation of privacy existed, and (2) whether the search was reasonable under all the circumstances. 560 U.S. at 756-57. The court also outlined the concurrence test, which initially assumes "that the offices of government employees . . . are covered by Fourth Amendment protections as a general matter," but further concludes "that government searches to retrieve work-related materials or to investigate violations of workplace rules . . . do not violate the Fourth Amendment." *Id.* at 757 (internal quotation marks and citations omitted). As discussed below, applying either test to the facts of the present case results in the same conclusion, namely, that the search of the charliemkj@yahoo.com email account was reasonable, and accordingly, there was no violation of Hoofnagle's Fourth Amendment rights.

1.      Reasonable Expectation of Privacy.

In applying the *O'Connor* tests, it is necessary first to determine whether Hoofnagle had a reasonable expectation of privacy with respect to the charliemkj@yahoo.com email account. Hoofnagle's Fourth Amendment rights are implicated only if the conduct of the Commission infringed upon an "actual

- 19 -

(subjective) expectation of privacy" that society is prepared to consider reasonable. *Untied States v. Shah,* No. 5:13-CR-328-FL, 2015 WL 72118, at *6 (E.D.N.C. Jan. 6, 2015) (internal quotation marks and citation omitted); *see also United States v. Jacobsen,* 466 U.S. 109, 113 (1984). "Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. The operational realities of the workplace, however, may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *O'Connor,* 480 U.S. at 717. "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *Id.* at 718.

The email account at issue was not owned or managed by the Airport. It was a free Yahoo! account created by Hoofnagle, with which he conducted both personal and Airport business. There was no other official email account. In fact, many of the commissioners used their own personal accounts to conduct Airport business on occasion. The Airport also had no policy limiting personal internet or email use on Airport computers. Such a policy would have limited Hoofnagle's expectation of privacy, because an employee rarely has a reasonable expectation of privacy in workplace computers when the employer has a clear policy concerning computers and monitoring of personal email activity. *United States v. Simons,* 206

- 20 -

F.3d 392, 398 (4th Cir. 2000).  Finally, access to the email account required a password.  Although this issue is strongly contested by the parties, Hoofnagle denies that he ever shared his password with anyone at the Airport.  Viewing all of these competing factors in the light most favorable to Hoofnagle, I conclude that a question of fact exists as to whether Hoofnagle had a reasonable expectation of privacy in the email account.

## 2.    Reasonableness of the Search.

A determination of whether Hoofnagle had a reasonable expectation of privacy is only part of the Fourth Amendment analysis.  I must next determine whether the defendants' search of Hoofnagle's email was reasonable.

As a general rule, warrantless searches "are per se unreasonable under the Fourth Amendment."  *Quon*, 560 U.S. at 760.  However, an exception to this general rule includes the "special needs, beyond the normal need for law enforcement" such as those present in the context of government employment, which "make the . . . probable-cause requirement impracticable, for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct.  *O'Connor,* 480 U.S. at 725 (internal quotation marks and citation omitted).  According to the *O'Connor* plurality, under such circumstances, "a government employer's warrantless search is reasonable if it is justified at its inception and if the measures adopted are reasonably related to the objectives of

- 21 -

the search and not excessively intrusive in light of the circumstances giving rise to the search." *Quon,* 560 U.S. at 761 (internal quotation marks and citation omitted). In addition, according to the concurrence, "government searches to retrieve work-related materials or to investigate violations of workplace rules . . . do not violate the Fourth Amendment." *O'Connor,* 480 U.S. at 732 (Scalia, J., concurring). In this case, the search of Hoofnagle's email account satisfies both of these standards.

"Ordinarily, a search of an employee's office by a supervisor will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." *Id.* at 726. Here, Hoofnagle's misconduct was already known to the Commission at the time of the search into the charliemkj@yahoo.com email account, so there would have been no need to search for evidence of work-related misconduct. Instead, the search was done for a noninvestigatory work-related purpose — to retrieve important records pertaining to the Airport that might have been contained in the email account. Accordingly, the search was justified at its inception.

A "search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive . . . ." *Id.* (internal quotation marks and citation omitted). Here, the search was

- 22 -

very limited in scope. The chairman of the Commission viewed the email account for about thirty to forty minutes to determine whether any of the emails contained important Airport business.[8] In addition, he opened the sent folder to view its contents, but the folder was empty. Accordingly, the search was not excessively intrusive and was reasonably related to the objective of retrieving Airport records.

Because the search was motivated by a legitimate work-related purpose and not excessive in scope, the search was reasonable. A "case can be decided by determining that the search was reasonable even assuming [the employee] had a reasonable expectation of privacy." *Quon,* 560 U.S. at 757. Therefore, even if Hoofnagle had a legitimate expectation of privacy in the email account, I find that because the search of the account was reasonable, no violation of Hoofnagle's Fourth Amendment rights occurred. Accordingly, the defendants are entitled to summary judgment on this claim.

## C. Stored Communications Act.

The defendants finally argue that they are entitled to summary judgment on Hoofnagle's Stored Communications Act claim. The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, establishes a criminal offense for whoever "intentionally accesses without authorization a facility through which an electronic communication service is provided" or "intentionally exceeds an authorization to

---

[8] At the time of the search, the password for the account was also changed. The new password was later provided to Hoofnagle.

- 23 -

access that facility," and by doing so "obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). The SCA also creates a civil cause of action, in which the plaintiff may obtain equitable or declaratory relief, reasonable attorney's fees and other costs, together with damages. 18 U.S.C. § 2707(b); *see also Van Alstyne v. Elec. Scriptorium, Ltd.,* 560 F.3d 199, 204 (4th Cir. 2009).

As an initial matter, the defendants claim that the SCA does not apply in this case because the Commission did not access emails that were "stored" pursuant to the definition of "electronic storage" under 18 U.S.C. § 2510 (17).[9] The defendants argue that because the emails had already been opened by Hoofnagle, they were not in storage for purposes of the SCA at the time they were viewed by Leonard. Courts disagree as to whether email messages remaining on an internet service provider's server after delivery fall within the SCA's definition of "electronic storage." *Compare Pure Power Boot Camp v. Warrior Fitness Boot Camp,* 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008) (holding that an email stored on an electronic communication service provider's systems after it has been delivered to the intended recipient, as opposed to email stored on a personal computer, is a stored communication subject to the SCA), *and Brooks v. AM Resorts, LLC,* 954

---

[9] 18 U.S.C. § 2510 (17) defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof, and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

- 24 -

F. Supp. 2d 331, 336 (E.D. Pa. 2013) (holding that email messages remaining on an internet service provider's server after delivery fell within the definition of "electronic storage" while emails downloaded and stored on a personal computer did not), *with Lazette v. Kulmatycki,* 949 F. Supp. 2d 748, 758 (N.D. Ohio 2013) (citing cases in which courts agree that only emails awaiting opening by the intended recipient were within the definition of "electronic storage").

As a practical matter, for the purposes of establishing a claim under the SCA, I do not think it makes any difference whether an email stored on an internet service provider's server has been opened or not. Internet service providers store all email, whether opened, read, sent, or even deleted. Accordingly, I do not find the defendants' argument in this regard persuasive.

Alternatively, the defendants argue that even if the SCA applies, Hoofnagle's claim fails for three reasons. First, the defendants claim that their conduct falls within the exceptions set forth in subsection (c) of the SCA. Next, they contend that Hoofnagle authorized the Commission and Airport staff to access his Yahoo! account. Finally, the defendants assert that, even if a violation of the SCA occurred, Hoofnagle is not entitled to recover because he has failed to prove any actual damages.

- 25 -

1.    Exceptions under 18 U.S.C. § 2701(c).

The SCA exempts a party from liability if the conduct at issue was authorized "(1) by the person or entity providing a wire or electronic communications service; (2) by a user of that service with respect to a communication of or intended for that user; or (3) [as provided] in section 2703, 2704 or 2518 of this title."  18 U.S.C. § 2701(c).

The defendants first argue that they are exempt from liability under § 2701(c)(1) because the Commission was the entity providing the "electronic communications service" and the Commission authorized the search.  The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Specifically, the defendants argue that the Commission was the electronic communications provider because the Airport provided a company computer for Hoofnagle, which he used to access the Yahoo! account during work hours.   However, in defining the person or entity providing an electronic communication, courts distinguish between emails stored on an employer's own computers and emails stored on accounts maintained by a third party electronic communication service provider, such as Yahoo!.  *See Pure Power Boot Camp,* 587 F. Supp. 2d at 554 (distinguishing between "a situation in which an employer is attempting to use e-mails obtained from the employer's own computers or

- 26 -

systems," and a situation in which "the e-mails at issue . . . were stored and accessed directly from accounts maintained by outside electronic communication service providers").

In *Pure Power Boot Camp,* an employer accessed a former employee's personal email accounts to gather evidence showing that the employee violated his restrictive covenant. *Id.* at 552-54. The court held that the employer's access of the employee's personal e-mails, which were stored and accessed directly from accounts maintained by an outside electronic communication service provider, was unauthorized, and thus violated the Stored Communications Act. *Id.* at 562. The court's reasoning centered on the fact that the employer "logged directly onto Microsoft's Hotmail system where the e-mails were stored, and viewed and printed them directly off of Hotmail's system." *Id.* at 556. There was no evidence that the emails were ever downloaded onto the employer's computers. *Id.*

Likewise, in this case, the emails were stored on a Yahoo! account, which is an outside electronic communication service provider. Leonard accessed the emails by logging directly into the Yahoo! account where they were stored and viewing them directly from Yahoo!'s system. There is no evidence that emails from the Yahoo! account were ever downloaded or stored on the Airport's computer. Accordingly, if the defendants' access was done without authorization, then such an action would constitute a violation of the SCA.

The defendants next argue that their conduct falls within the exemption under subsection (c)(2) because the Commission was a "user" of the computer, and the communications sent to charliemkj@yahoo.com concerning Airport business were intended for the Commission. As defined by the SCA, a "user" is any person or entity who uses an electronic communication service and is duly authorized by the provider of such service to engage in such use. 18 U.S.C. § 2510(13). However, as discussed above, Yahoo!, not the Commission, was the entity providing the electronic communications service. Therefore, even if, as the defendants claim, the Commission used the Airport computer, that, alone, does not make the Airport or Commission a "user" under subsection (c). To be a "user" in this regard, the Commission would need to be a user of the Yahoo! account, not merely a user of the office computer.

It is true that Hoofnagle created the account, in part, as a means to conduct Airport business, a purpose for which the account was in fact used. However, as the individual who used his personal information to create the account and establish a password, Hoofnagle was clearly the person duly authorized by Yahoo! to use and access the account, not the Airport or the Commission. Accordingly, the defendants have not established that they are exempt from liability under § 2701(c).

2. Authorization.

The defendants next argue that there is no SCA violation because Hoofnagle expressly and implicitly authorized access to the Yahoo! account by giving Airport staff and the Commission permission to use the account for business purposes, leaving the email account open on the Airport computer, providing the password, and using the account for Airport business. Intentionally accessing and obtaining emails directly from an electronic service provider is a violation of the SCA only if done without authorization. 18 U.S.C. § 2701(a). Therefore, the defendants did not violate the SCA if they can show the Commission was authorized to access the Yahoo! account.

The defendants assert that Hoofnagle expressly authorized the Commission and Airport staff to access the account and provided his password. However, Hoofnagle specifically denies this, and the record contains no additional facts on the issue. Thus, a genuine issue of material fact exists as to whether Hoofnagle did, in fact, authorize access to the account.

The defendants alternatively claim that they did not need authorization to access the emails because Hoofnagle had no reasonable expectation of privacy in the account. Specifically, the defendants argue that when official business was carried out on the account, Hoofnagle implicitly authorized the Commission to access the account in order to view its own business emails. In cases where an

Case 1:15-cv-00008-JPJ-PMS   Document 59   Filed 05/24/16   Page 29 of 32   Pageid#: 1575

employee has no reasonable expectation of privacy, the employer does not need consent to search the employee's computer files. *Pure Power Boot Camp,* 587 F. Supp. 2d at 560. However, as discussed previously, a question of fact exists as to whether Hoofnagle had a reasonable expectation of privacy in the email account.

Even assuming that the defendants had authorization to access the email account, they still would not necessarily be entitled to judgment as a matter of law. A person may be liable under the SCA when he intentionally *exceeds an authorization* to access a facility through which an electronic communication service is provided, thereby *altering* or *preventing* authorized access. *See* 18 U.S.C. § 2701(a)(2). The defendants not only accessed the account in order to view the emails and retrieve business related documents, but they also changed the password, thereby preventing Hoofnagle from gaining access to the account, albeit for a limited period of time. Therefore, a material issue of fact remains as to whether the defendants, by changing the password, exceeded any authorization they might have had to access the emails.

3. Damages.

Finally, the defendants argue that Hoofnagle cannot recover for any SCA violation because he has offered no proof of actual damages. In support of their argument, the defendants cite to *Van Alstyne,* 560 F.3d 199. However, the defendants' reliance on *Van Alstyne* is misguided.

- 30 -

In *Van Alstyne*, the Fourth Circuit stated that "plaintiffs pursuing claims under the SCA must prove actual damages in order to be eligible for an award of statutory damages." *Id.* at 202. Therefore, in order for Hoofnagle to recover statutory damages, he must prove actual damages. However, "proof of actual damages is not required before an award of either punitive damages or attorney's fees." *Id.* at 209. The Fourth Circuit held that "[i]f the violation [of the SCA] is willful or intentional, the court may assess punitive damages." *Id.* The court further held that § 2707(b)(3) permits an award of attorney's fees absent any proof of actual damages. *Id.*

Therefore, contrary to the defendants' assertion, Hoofnagle may be entitled to recover punitive damages and attorney's fees without proof of actual damages.[10] Accordingly, the defendants are not entitled to summary judgment on Hoofnagle's claim for violation of the SCA.

---

[10] To recover punitive damages, Hoofnagle will be required to show that the defendants' violation was willful or intentional. "The sole limitation [under § 2707(c)] is that the violation of the SCA be 'willful or intentional'. . . ." *Van Alstyne,* 560 F.3d at 209. Although the SCA does not define "willful or intentional," it has been interpreted to mean knowledge that one's conduct is unlawful. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F. Supp. 2d 489, 556 (S.D.N.Y. 2011) (holding that defendants' violation of SCA was neither willful nor intentional because there was no basis to conclude that defendants were "aware of the statute, or knew that their conduct was otherwise unlawful").

### III.

For the foregoing reasons, the defendants' Motion for Summary Judgment (ECF No. 39) and Amended Motion for Summary Judgment (ECF No. 43) are GRANTED in part and DENIED in part. Summary judgment is hereby granted in favor of the defendants as to Counts I and II of the First Amended Complaint, but denied as to Count III. The court will schedule a trial as to Count III.[11]

It is so **ORDERED**.

ENTER: May 24, 2016

/s/ James P. Jones
United States District Judge

---

[11] Where damages are sought under the SCA, the parties are entitled to a jury trial. *Vista Marketing, LLC v. Burkett,* 812 F.3d 954, 957 (11th Cir. 2016).

Case 1:15-cv-00008-JPJ-PMS   Document 59   Filed 05/24/16   Page 32 of 32   Pageid#: 1578